# Johnson *v.* Armstrong.

### Contest of Probate of Will.

97 731
98 271
97 731
104 646
97 731
107 428
97 731
135 56

1.  *Competent evidence of insanity.*—When the testator was seventy years old at the time of his death, and twelve years prior thereto was stricken with paralysis and afterwards took into his household H., a woman, whom he claimed was his illegitimate daughther, lived in immoral intercourse with her, became estranged from his family, and with this woman moved to another county and lived there with her till he died, children having been born of their intercourse, and upon his death bequeathed all his property to J., one of his sons, it was competent, in a proceeding by the heirs to contest the probate of the will on the ground of insanity, to prove that H. resembled one of testator's daughters, and that she was in fact his illegitimate daughter, to show testator's insanity.

2.  *Right to assail or impeach adversary's witness, not lost by cross-examination as to any relevant matter.*—A party to an action may, on cross-examination, prove a fact by a witness of the adverse party, and he does not thereby vouch for his credibility, or forfeit the right to impeach him as being a witness of his adversary.

3.  *Presumption that insanity continues, not indulged.*—A finding that a testator was insane at any time prior to the making of the will does not support a presumption that the insanity continued to the making

[Johnson v. Armstrong.]

of the will, unless it is also found that the insanity is habitual and fixed.

4. *Error to submit to jury a question of which there is no evidence.* Where a will is contested on the the ground of undue influence, and there is no evidence whatever of undue influence, it is erroneous to submit such question to the jury.

5. *Correct definition of undue influence.*—A charge that "undue influence," must be such as in some measure destroys the free agency of the testator, and prevents the exercise of that discretion which the law requires that a party should possess, as essential to a valid testamentary disposition of the property," is a correct definition of "undue influence," and was properly given.

6. *Argumentive charge should not be given.*—A charge that "positive fraud or undue influence is hard to prove, is generally done by proving facts and circumstances to which the jury may look to infer fraud or undue influence," is merely argumentive and should be refused.

APPEAL from the Probate Court of Coffee.

Tried before Hon. B. M. STEPHENS.

Probate was contested. The facts sufficiently appear in the opinion. The contestants asked the court to give the following written charges to the jury: (1.) "That insanity is a disease, and if the jury are satisfied, reasonably, that the testator was, at any time before the execution of the will, insane, then the jury should find against the will, unless the jury are satisfied, by clear and satisfactory proof, that the testator had been, either temporarily or permanently, relieved of his insanity, before the execution of the will; and, unless the jury believe that the testator was permanently relieved of the insanity, and they should be satisfied, by clear and satisfactory proof, the will was executed at a time when he was temporarily free from insanity, the jury should find the will invalid." (2.) "If the jury believe from the evidence that the woman Hinson, exercised undue influence over the mind of J. C. Johnson, and procured the will made to J. W. Johnson, then they must find for the contestants." (3.) "If the jury believe from the evidence that the will is the offspring of an undue influence exercised over J. C. Johnson, either by J. W. Johnson or Emma Hinson, in behalf of J. W. Johnson, then they must find for the contestants." (4.) "If the jury believe from the evidence that the will is the result of an undue influence extended over J. C. Johnson by Emma Hinson, in behalf of the said J. W. Johnson, then they must find for the contestants." (5.) "Undue influence must be such as in some measure destroys the free agency of the testator, and prevents the exercise of that discretion which the law requires a party should possess, as essential to a valid testamentary disposition of the proper-

[Johnson v. Armstrong.]

ty." (6.) "Positive fraud or undue influence is hard to prove; is generally done by proving facts and circumstances to which the jury may look to infer fraud or undue influence."

W. D. ROBERTS, for appellant. (No brief came to the hands of the reporter.)

H. L. MARTIN, for appellee, cited 71 Ala. 397. 38 Ala. 75, 30 Ala. 237; 74 Cal. 52, 2 Brick. 540, Sec. 364, 22 Ala. 532; 17 Ala. 243; 13 Ala. 68; 33 Ala. 75; 21 Ala. 311; 28 Ala. 107.

HEAD, J.—Appellant, James W. Johnson, the sole devisee and executor therein named, propounded for probate what purported to be the will of his father, John C. Johnson. The alleged testator died on the 31st day of January, 1891. The will purports to have been executed on the 20th day of September, 1890. The probate was contested by heirs of the decedent, on the grounds, as alleged in caveat: "(1.) That the supposed will is the offspring of fraud practiced upon deceased. (2.) That it is the offspring of an insane delusion in the mind of deceased. (3.) That it is the offspring and result of undue influence exerted and exercised over his mind and will. (4.) That deceased was not of sound and disposing mind at the time he signed the instrument. (5.) Undue influence and fraud. (6.) Undue influence." The verdict was in favor of contestants, and proponent appeals. There are many exceptions to testimony, which must be solved in the light of the general tendency of the whole evidence upon which contestants rely, which is about as follows: Deceased was about 70 years of age at the time of his death. Until 1880 he resided in Henry county, Ala., and had raised a family there, and had accumulated considerable property, worth from fifteen to twenty thousand dollars. His children consisted of five daughters and four sons, the youngest of whom was about 30 years of age at his death. In 1879, he suffered a stroke of paralysis, which some of the testimony tends to show considerably impaired his health and strength, and that thereafter his mind became impaired to such extent that in the opinion of some of the witnesses it was unsound. Up to the occurrence of this misfortune he had been a vigorous man, both in body and mind; was a man of moral, upright habits and demeanor, and lived upon terms of affection and friendship with his wife and children, and was prosperous in the accumulation of property. The contestants contended, and in-

troduced a line of testimony to show that as a result of his impaired condition of body and mind produced by the paralysis, his moral nature changed, and that he took to his home a woman named Emma Hinson, who, he said, was his illegitimate daughter, and lived in immoral intercourse with her; that by reason of this conduct his family ties were broken up, a separation between him and his wife took place, he became estranged more or less from his children in Henry county, and finally, in 1880, he left that county and moved to Coffee county, his wife living with one of her married daughters; that not long after he settled in Coffee county the woman with whom it was said he had lived in immoral intercourse went there and lived with him until he died; that the criminal conduct between them continued and children were born of the cohabitation. Contestants contended that this woman was, in fact, his illegitimate daughter. These facts, in connection with many details of acts and peculiarities on the part of deceased, testified to by witnesses, and the opinion of witnesses that he was a man of unsound mind, were relied upon by contestants to establish the alleged insanity, as well as to show his susceptibility to the undue influence which there was some evidence tending to show the proponent had practiced upon him to procure the will. The proponent resided in Macon, Ga. The will devised to him, as sole devisee, the real estate of the decedent. On the 11th day of October, 1890, the deceased conveyed by deed to one of the children of the said woman who lived with him 120 acres of land, and to the other of said children 40 acres.

The following testimony was admitted against the objection and exception of the proponent: Witness King was allowed to testify as to how many children the woman Hinson had, also that deceased left all his property at his residence place in possession of Hinson when he died. Witness Pelham was allowed to testify to acts of illicit intercourse between deceased and Hinson. Witnesses Parish and Garner were allowed to testify that Mrs. Johnson, wife of deceased, lived at her daughter's, Mrs. Hutto, who took care of her as well as she could. Witness H. C. Johnson was allowed to testify that after deceased was stricken with paralysis some of his children, in 1880, tried to get him to live with them and he refused; and Armstrong was allowed to testify that his wife, a daughter of the deceased, asked him to live with her. Witness, Georgianna Hutto, was allowed to state that deceased came to her house while her mother was living there, and quarreled with her about a bedstead. Witness

[Johnson v. Armstrong.]

Wm. Hutto was allowed to testify that one Sunday morning he went to the house of deceased and found Mrs. Johnson and her daughter out of doors, and the old man was mad. These several facts were a part of the history and conduct of deceased after he became diseased, and, in connection with other evidence, tended to shed some light on the condition of his mind at the time of making the will. Probably some portions of the statements of the witnesses were objectionable, but the objections were directed to the statements as a whole, which authorized the court to overrule them, notwithstanding the objectionable matter. Witness King showed sufficient acquaintance with deceased to give his opinion as to the sanity of deceased. It was competent for contestants to prove by witnesses Parish and Jesse Hutto, that the children of Mary Hutto, a deceased daughter of alleged testator, had no property. We think it was competent, under all the circumstances, for contestants to prove that the woman Hinson, was an illegitimate daughter of deceased, and that the testimony of witness Yelverton, that Hinson favored Mrs. Armstrong, a daughter of deceased, was admissible. Proponent offered to prove by witness Yelverton, on cross-examination, the execution of certain deeds made by deceased to certain of his grandchildren in 1890, making provision for such grandchildren. The objection to the proposed proof was that proponent could not make it by the witness Yelverton, without making him his own witness, and the court so held and refused to admit the evidence, except upon terms that thereby proponent should make the witness his own. We think this was error. A party on cross-examination may interrogate the witness as to any matter relevant to the issue, without vouching for his credibility, or forfeiting the right to assail or impeach him as the witness of his adversary. The scope and effect of the court's ruling were to require proponent to vouch for the credibility of Yelverton as to all matters of which he had testified and preclude his impeachment as a witness if that step had been desirable. The court permitted the witness Yelverton, against the objection and exception of proponent, to testify that "Mrs. Hinson was left in possession of the property of said Johnson at the time of his death, consisting of 150 bushels of corn, fodder, three mules, wagon and two buggies ; that she has a negro working on the place using the mules now." It does not appear from his testimony that deceased had any agency in leaving her in possession of the property, and certainly he had none, as appears, in the use she is now making of the property. She may have been left in possession so far as Yelverton states, by some one else. The court

erred in admitting the testimony. The court clearly erred in allowing the witness, H. C. Johnson, to testify that he asked the woman, Hinson, how much money his father left at his death, and that she at first said he left $2.25, and two or three hours afterwards said it was $6.25. Upon no principle can such a declaration be admissible. It was improper to allow the witness Georgianna Hutto to state her conclusions as to the reasons why her father and mother separated in 1880 ; or to state that her husband loaned her money twice to go to Macon, Ga. The court did not err in overruling the objections specified to the introduction of the deeds made by deceased to children of the woman Hinson. It was competent for contestants to prove the value of the estate of deceased at the time of his death.

When habitual and fixed insanity is shown by the contestants, the presumption of law is that it continues and existed at the time of the subsequent making of the will, unless that presumption is overcome by proof showing that the will was made in a lucid interval. To have the effect, however, of raising such a presumption and casting the burden of showing that the will was made in a lucid interval, upon the proponent, the contestants must establish habitual and fixed insanity. " Occasional fits, or aberrations of mind, produced by temporary causes are not sufficient. There is no presumption in favor of the continuance of anything temporary or ephemeral in its nature. The disease of the mind must be of such general and permanent character, as human experience shows generally continues."—*O'Donnell v. Rodiger,* 76 Ala. 222. Under the evidence in this case, it was a question for the jury to determine whether the insanity, if any at all, was established by the contestants prior to the making of the will, was of the one charactor or the other—habitual and fixed, or occasional and temporary. Charge No. 1 given at the request of contestants was therefore erroneous. It predicated a presumed continuance of insanity upon a finding that insanity existed *at any time* prior to the making of the will, whether of the one character or the other.

We have carefully examined the evidence, and it fails to disclose a single fact or circumstance tending to show that the woman Hinson, in any way whatever, exercised any influence upon the mind of the deceased procuring him to make the will. It was not proper, therefore, to submit such a question to the jury, and the court erred in giving the 2nd, 3rd and 4th charges requested by contestants. The 5th charge asserts a correct principle, aud was properly given. The 6th charge is purely an argument and ought to have been refused.

The judgment of the Probate Court is reversed and the cause remanded.