## Herr's Estate. Wilson's Appeal.

*Wills—Execution—Mental incapacity—Undue influence—Issue devisavit vel non—Refusal.*

1. A delusion which will render invalid a will executed as the direct result of it, is an insane belief or a mere figment of imagination, a belief in the existence of something which does not exist, and which no rational person would believe did exist. Where the belief is based upon some substantial ground, reasonably calculated to produce it, the theory of an insane delusion necessarily disappears.

2. One who is of a sound and disposing mind is entitled to distribute his property as he may see fit, without regard to the personal motives or prejudices which influence him.

3. Undue influence is an influence existing at the time of the execution of the will and such as to constitute physical or moral coercion to such a degree as to prejudice the mind of the testatrix and destroy her full agency.

4. An issue devisavit vel non asked for on the grounds of mental incapacity and undue influence was properly refused where it appeared that the evidence as to the former consisted mainly of testimony that testatrix had an attack of epilepsy at a time nine years prior to the date of the will, while opposed to this was the testimony of two physicians who attended deceased at the time and shortly prior to her death, to the effect that no epilepsy existed, and also the testimony of the witnesses to the will, to the effect that testatrix was mentally sound and competent when the will was executed, while the allegation of undue influence was supported merely by evidence to the effect that the testatrix subsequent to the execution of her will and before her death, partly carried out its provisions by giving a large part of what would have belonged to her residuary estate to the beneficiary named in the will, in consideration of the payment to her of interest thereon during her life.

Argued Oct. 11, 1915. Appeal, No. 265, Jan. T., 1915, from decree of O. C. Lancaster Co., Jan. T., 1914, No. 48, in the matter of S. Jane Wilson v. The Church Erection Society of the United Brethren in Christ; The Home, Frontier and Foreign Missionary Society of the United Brethren in Christ for Home Mission purposes;

The Home, Frontier and Foreign Missionary Society of the United Brethren in Christ for Foreign Mission purposes; The Union Biblical Seminary of the United Brethren in Christ at Dayton, Ohio, now known as The Bonebreak Theological Seminary and Harry N. Nissley, executor of Mary A. Herr. Before MESTREZAT, POTTER, STEWART, MOSCHZISKER and FRAZER, JJ. Affirmed.

Petition for issue devisavit vel non. Before SMITH, P. J.

The facts appear by the opinion of the Supreme Court.

The lower court dismissed the petition. S. Jane Wilson appealed.

*Error assigned*, among others, was in refusing issue devisavit vel non.

*B. F. Davis* and *C. E. Montgomery*, for appellant.

*John E. Malone*, with him *B. Frank Kready*, for appellees.

OPINION BY MR. JUSTICE FRAZER, October 28, 1915:

The sole question for determination in this case is whether the lower court erred in refusing an issue devisavit vel non and dismissing the appeal from the decree of the register of wills in the estate of Mary A. Herr, deceased. Mrs. Herr died in 1913, at the age of 83 years, leaving a will made nine years prior to her death, in which, after giving specific legacies to certain missionary and church extension societies connected with a religious organization or church known as the United Brethren in Christ, gave her residuary estate, amounting at that time to about $130,000.00, to the Union Biblical Seminary of the United Brethren in Christ, Dayton, Ohio. The contestant is a half sister and the nearest living relative of the deceased, and the petition for an issue is based on the ground of mental in-

capacity of testatrix to make a will, and also alleges undue influence exercised by persons interested in the church which was given practically the entire estate. The testimony relating to the execution of the will is uncontradicted. It appears testatrix went unattended to the office of her counsel, in the City of Lancaster, who prepared the will at her request and read it over to her, and she then signed it in his presence and in the presence of two other witnesses, one of them at one time having been her personal counsel. All three of these gentlemen signed as witnesses to the will. While waiting for the will to be written testatrix expressed a desire to have her former counsel as a witness to the will, "so that she would be sure it would be all right." Both witnesses to the will, her counsel having since died, testified to having conversed with testatrix while the will was being prepared, and that she was of undoubted mental capacity to make a will. It also appeared that she had at times made known her intention to leave at least a portion of her estate to the United Brethren Church as a memorial to her deceased son. Similar statements were also made to the executor of her will, to whom she confided her intention to have her son enter the theological seminary mentioned in the will, and she spoke of her resolution since his death to create a memorial to her son by giving her money to help educate young men for the ministry. As further evidence of her intention in this respect she gave to that institution during her lifetime and subsequent to the execution of the will, various sums of money amounting in all to $79,000.00, with provision that interest thereon be paid to her during her life. Other witnesses, who had known and transacted business with testatrix for years, testified that, although in delicate health, she was educated and intelligent and of a very decided disposition, and attended to her own business affairs, in the conduct of which she was shrewd and prudent.

The evidence produced by contestant in support of the

allegation of mental incapacity consists mainly of testimony that testatrix was subject to "spells," which a physician produced by contestant stated were epileptic fits, a disease which is progressive in character and tends to weaken the victim both mentally and physically. This witness was not testatrix's regular family physician, but was called in an emergency at one time when she was suffering from an attack which he describes as epilepsy. It is important to note, also, that this occurrence was in 1895, nine years prior to the execution of the will, and this was the only time the witness had seen testatrix in such condition. On the other hand, the physician who treated her on a number of occasions subsequent to the execution of her will described her attacks as hysterical and stated there was no evidence of epilepsy. The physician who attended her during her last illness testified the cause of her death was arterial sclerosis, and that he had attended her on various occasions for a period of four years prior thereto and had at no time seen evidence of epilepsy. It is not even contended by contestant that these supposed attacks of epilepsy were constant or prevented testatrix from transacting business at other times, and the physician who testified for contestant stated that even in cases of epilepsy the sufferers may be able to transact business up to the time of their death. Considering the medical testimony of contestant in its strongest light, we have but one attack of epilepsy, at a time nine years prior to the date of the will. Opposed to this is the testimony of two physicians who attended deceased at the time of her death and shortly prior thereto to the effect that no epilepsy existed, and also the testimony of the witnesses to the will, to the effect that she was mentally sound and competent when the will was executed. On this state of the evidence the lower court was clearly right in refusing an issue on the ground of mental incapacity. The evidence to the effect that testatrix was queer and eccentric, and subject to "spells," is insufficient to raise a question for

the jury, especially in view of the fact that the opinions of these witnesses as to the unsound mental condition of testatrix were in most cases based on very trivial circumstances, as, for instance, the fact that she was miserly, did not provide herself with sufficient food, did her own house work to save money, etc.

It is also contended by appellant that the will was induced by hallucinations or delusions under which testatrix had been laboring for years, to the effect that her friends and relatives, with particular reference to the contestant, her nearest relative, were endeavoring to rob her of her property, and had employed attorneys for that purpose. An examination of the evidence shows there were natural causes for this feeling toward contestant. Testatrix had not been on good terms with contestant for a long period of years, possibly from childhood, but certainly from a time when there was a dispute concerning the settlement of the estate of their mother, at which time contestant presented a claim against the estate for services for nursing her mother in her last illness. Since that time the relations between contestant and testatrix were most unfriendly, and this state of affairs continued up to the time of the death of testatrix.

A delusion which will render invalid a will executed as the direct result of it, is an insane belief or a mere figment of imagination, a belief in the existence of something which does not exist, and which no rational person would believe did exist: Taylor v. Trich, 165 Pa. 586; Alexander's Est., 246 Pa. 58. The moment it is discovered, however, that what at first sight was apparently a delusion is in fact based upon some substantial ground, reasonably calculated to produce the belief held by testatrix, the theory of the insane delusion necessarily disappears. One who is of sound and disposing mind is entitled to distribute his property as he may see fit, without regard to the personal motives or prejudices which influenced him: Dean v. Negley, 41 Pa. 312; Phillips' Est., 244 Pa. 35. His prejudices, likes or dislikes are

his own as much as the property which he distributes, and the fact that his method of distribution may offend our sense of propriety and justice is no reason to set aside the will: Cauffman v. Long, 82 Pa. 72; Phillips' Est., 244 Pa. 35-47.

There is practically no evidence to support the allegation of undue influence. The testamentary capacity of deceased at the time of making her will being fully established, and there being no evidence that the residuary legatee or its officers or agents occupied a confidential relation to testatrix, the burden was clearly upon contestant to prove the fact of undue influence. The evidence at most merely shows testatrix had, subsequent to the execution of her will and before her death, partly carried out its provisions by giving a large part of what would have belonged to her residuary estate to the beneficiary named in the will, in consideration of the payment to her of interest during her life thus insuring her support and at the same time affording her the pleasure of seeing her money used in the way which she had provided for its use after her death. Certainly this fact alone cannot be considered sufficient to prove undue influence, even though the gift was made at the solicitation of persons interested in the charity. The question is whether undue influence existed at the time the will was made, and whether the influence was such as to constitute physical or moral coercion to such a degree as to prejudice the mind of testatrix and destroy her full agency in making her will: Phillips' Est., 244 Pa. 35. We find no such proof in this case.

The decree of the lower court is affirmed.