## Dowling Estate

Before Sinkler, P. J., Klein, Bolger, Ladner, and Hunter, JJ.

*Ellis Rudman,* for exceptant.

*Thomas Boylan,* contra.

HUNTER, J., December 19, 1949.—Contestant is a nephew of decedent, her sole next of kin, who contends that decedent did not have testamentary capacity, and was possessed by an insane delusion toward her nephew.

She gave her $15,000 estate to persons whom she described as "old friends", and recited in her will that she had not made provision for her nephew "due to the fact that since the death of my sister, Katharine Dowling, and particularly within the last six months his treatment of me has been very bad and I definitely do not want him to obtain any part of my estate".

A charge of undue influence was withdrawn at the hearing.

The register of wills, after caveat and hearing, refused to award an issue. Upon appeal to this court, the matter was heard de novo by Sinkler, P. J., who determined that no substantial dispute existed, and sustained the decree of the register admitting the will to probate.

The long and painstaking opinion of the hearing judge recites all important facts, and no extended reference to them is necessary.

Decedent was 80 years of age when she executed her will on May 25, 1943. She died March 30, 1946. In October 1942 the nephew took her from Philadelphia to his home in Trenton, N. J., where she stayed until March 30, 1943, when a fall down steps and a broken arm caused her removal to the Mercer Hospital in Trenton, from which she was discharged on May 12, 1943. She did not return to her nephew's home, but was taken by Mrs. Dollas, one of the legatees, to the latter's home in Philadelphia, where she stayed a few days, after which she moved to a private boarding home where the will was executed. Subsequently she fell twice, broke her hip, was treated in the Price and Graduate Hospitals, spent some time with Mrs. Dollas, and finally entered a convalescent home where she stayed until the time of her death.

The relations between decedent and the nephew in his home in Trenton were cordial for the first two or three months, after which friction began, which developed, especially after her admission to the Mercer Hospital, into complaints about her nephew and an alleged "persecution complex". In the hospital she was confused as to where she was, complained about everything, the nursing attention, attention of internes, etc. The testimony of three physicians who examined her in Trenton, and who were called by contestant as witnesses, is analyzed at length in the opinion of the hearing judge.

The will was executed May 25, 1943, two weeks after decedent's discharge from the hospital and return to Philadelphia. It was prepared by Harry Donnelly, a member of this bar, who had been her attorney in the settlement of a sister's estate in 1942. She came to his office, and herself dictated its terms. It was executed at the home of Madeline Clark, who conducted a boarding home for elderly people in Philadelphia where the decedent was then living. Miss Clark and

Gertrude Swift (formerly Hogan), Mr. Donnelly's secretary, were subscribing witnesses.

Mr. Donnelly and the subscribing witnesses testified that she was a normal person of sound mind.

Dr. Henry P. Boyer, who had been decedent's physician, treated her at his office on May 17 and 31, July 6 and August 11, of 1943. She was weak and ill-nourished, principally, and she had some pain in her arm. He testified: "I saw no difference in her mental condition then than all those previous years. She was perfectly normal mentally as far as I could see."

A will which is prepared by decedent's own attorney, free of the influence of legatees, and supported by the testimony of decedent's own physician, and executed in the presence of disinterested witnesses, can be overcome only by strong evidence: Ross Will, 355 Pa. 112; Sturgeon Will, 357 Pa. 75.

As stated by the hearing judge, the pain and suffering and shock explain the conduct of decedent after she was admitted to the hospital in Trenton.

The principal reliance of contestant is upon decedent's alleged delusions of persecution. She complained to Dr. Burroughs in Trenton of mistreatment by her nephew, and she subsequently told witnesses in Philadelphia that he pushed her down the stairs.

In Alexander's Estate, 246 Pa. 58 (62), it was said:

"A delusion which will render invalid a will executed as the direct result of it is an insane belief or a mere figment of the imagination—a belief in the existence of something which does not exist and which no rational person, in the absence of evidence, would believe to exist: Taylor, Executor, v. Trich, et al., 165 Pa. 586; McGovran's Est., 185 Pa. 203; Bennett's Est., 201 Pa. 485."

Where there is substantial ground for belief, the theory of delusion falls: Alexander's Estate, supra; Herr's Estate, 251 Pa. 223.

A testator is entitled to his prejudices, and if of sound mind has the unquestioned right to give his property to whom he pleases: Wetzel v. Edwards, 340 Pa. 121; Mohler's Estate, 343 Pa. 299.

The declaration of decedent that the nephew "pushed her down the stairs" had no basis in fact. We cannot see, however, that the will was its direct result, because it was but one incident among many in the making of the will.

There were true facts at the basis of her dislike. After the settlement of the estate of Katharine Dowling, deceased sister of decedent, the nephew had permitted her to collect and retain for her own use the entire interest on a mortgage of which she owned three fourths; on March 1, 1943, he notified the mortgagor that thereafter his one fourth of the interest should be paid to him. On the day of her discharge from the hospital in Trenton, she stopped at his home on her way to Philadelphia, and he refused to give her her clothing, and later her furniture, until she paid him certain moneys which were due him for bills which he had paid. The dispute was placed in the hands of their respective attorneys, and in the end each party signed a general release, which transaction in July 1943 terminated the relations between them. He did not see her thereafter until her death in 1946.

We believe that decedent was of sound mind at the making of the will, which is the decisive time to be considered: Olshefski's Estate, 337 Pa. 420. Being familiar with the conduct of her nephew, she was entitled to pass judgment upon it. As was said in Alexander's Estate, 246 Pa. 58 (64 supra), referring to a testator's dishersion of his daughter:

"His opinion of his daughter's conduct, upon which he acted in making his will, may have been wholly unreasonable, but this can have no weight in the present

inquiry, unless it be shown that the opinion rested on an imagined state of facts."

We agree with the hearing judge that the evidence as a whole does not make out a substantial dispute, and that a verdict of a jury against the will would have to be set aside as judicially untenable: Sturgeon Will, 357 Pa. 75.

The exceptions are dismissed and the decree of the hearing judge is confirmed absolutely.